Filed 5/2/25  P. v. Summerville CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C100754 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 23FE015111, 23FE015112) |
| v. | |
| DOMINIC SUMMERVILLE, | |
| Defendant and Appellant. | |

Defendant Dominic Summerville pled no contest to stalking and vandalism in a consolidated case.  The court sentenced him to two years of probation.  Summerville appeals claiming the trial court abused its discretion when it found he was an unreasonable risk to public safety and denied his petition for mental health diversion.  We will affirm.

FACTUAL AND PROCEDURAL BACKGROUND

From October 2022 to September 2023 Summerville had several incidents with his family and a neighbor.  He would typically arrive at his mother's home several times a

1

week asking for money and food, which escalated in nature and frequency from June to August 2023.

In October 2022, Summerville arrived at his mother's house and appeared to be very paranoid. He told his mother that he was being "gang stalked" and that "they" were after him. He then took his mother's phone and ran away. His mother found him shortly thereafter and picked him up in her car, but Summerville opened the door, rolled out of the car, and ran away again. His mother called 911. Police officers responded and placed Summerville on a hold pursuant to Welfare and Institutions Code section 5150.

In March 2023, Summerville called his mother again claiming he was being stalked and that he was being coerced out of living at his grandmother's home. Summerville said he was hearing voices, that somebody was going to get hurt if they did not stop, and that he was ready to slap his grandmother's neighbor. Three days later Summerville was evicted from his grandmother's house.

In April 2023, Summerville showed up at his mother's house and told her the voices in his head "were telling him to go back to [his] grandma's house." He took food and drinks from his mother's house and demanded money from his mother. Summerville's mother became increasingly more nervous because of his behavior. The next day he returned to his mother's house asking for money. At first, his mother refused to give him money. However, Summerville's mother finally gave him some money so that he would leave. Summerville returned to her house later that day while his mother was out and took food and drinks from the house.

On June 8, 2023, Summerville slept in his car outside of his mother's house. In the morning he came to the house to ask for food and money but his mother told him to leave her alone. He waited in his car all day outside of her house. About 3:00 p.m., he returned to the house but his mother told him she would not open the door and that she would call the police. Later she began to smell what she thought was gasoline near her front door. She opened the door and smelled a "strong gasoline odor." Summerville's

2

sister, who lived with his mother, reviewed footage from the front door security camera and saw Summerville throw a "clear jar of liquid on the front porch area." The investigating officer later testified that law enforcement was not present on the day of the incident and could not confirm whether the liquid was gasoline.

A few days later, Summerville's mother and sister obtained a temporary restraining order against him. On June 12, 2023, Summerville returned to his mother's house and said, "[I]f you give me money, I will leave." Summerville's mother called the police because she felt trapped. Police officers arrived at the house and served Summerville with the temporary restraining order. Summerville then inundated his mother with approximately 50 phone calls, text messages, and e-mails. Over the next three months, Summerville continued to send his mother, sister, and neighbor bizarre text messages and e-mails asking for money, accusing them of stalking him, creating "game apps" that cause Alzheimer's disease, and hacking his electronics. He repeatedly alluded to his three machetes. Summerville said when he figured out who was behind the stalking he would kill them.

On June 30, 2023, Summerville's mother and sister obtained a permanent restraining order against him. Summerville's mother was unable to personally serve him with the restraining order.

On August 1, 2023, Summerville vandalized his sister's car and threatened her, demanding she "get out of his email account before he d[id] more to her car." He also texted his sister, threatening to "blow up her shit," stating that keying her car and denting the trunk was a warning, and telling her to inform their mother, "I ain't playing." Summerville also threatened to kill his mother or "he would have someone he knows do it." On August 2, 2023, Summerville kicked a hole in the door of his mother's house while she and his sister were home, caused a cherry bomb to detonate on his mother's front porch, broke his grandmother's bird feeder, and threw a rock through the window of his grandmother's neighbor.

3

On September 25, 2023, police arrested Summerville. He contacted his mother again, calling her from jail. At a preliminary hearing, the court stated it disagreed with pretrial services' assessment that Summerville could be released on pretrial release. The court found there was no less restrictive method to place Summerville prior to trial. Citing public safety concerns for Summerville's family, his mental health struggles, the underlying charges, and his "concerning" statements to his family, the court denied bail.

An amended consolidated information charged Summerville with stalking (Pen. Code,[1] § 646.9, subd. (a)), stalking in violation of a temporary restraining order (§ 646.9, subd. (b)), and vandalism (§ 594, subd. (a)). In November 2023, a misdemeanor complaint, unrelated to this appeal, charged Summerville with violating a restraining order, alleging he asked his father to send a text message to his mother asking her to "drop the charges" against him.

In February 2024, Summerville requested mental health diversion pursuant to section 1001.36. To support his claim he submitted two assessments from the Department of Behavioral Health Services, which stated he suffered from bipolar disorder, alcohol use disorder, amphetamine use disorder, and cannabis use disorder. The substance use and prevention treatment assessment stated family and mental health issues contributed to his substance abuse. The clinical assessment stated Summerville struggled with mental health for "quite some time" and that he would go unmedicated or use substances, including methamphetamine, marijuana, and alcohol, to manage his symptoms. His mental health history included "depression, mania, auditory hallucinations, anxiety, and trauma." It indicated Summerville previously received therapy in the community to treat grief and trauma, and that he believed he would benefit

---

[1] Undesignated statutory references are to the Penal Code.

from additional interventions.  The clinical assessment also indicated Summerville did not present a danger to others.

Defense counsel asserted Summerville's mental disorders were a significant factor in the commission of the charged offenses.  Counsel further argued Summerville did not pose an unreasonable risk of committing a super strike if treated in the community, citing his lack of a prior criminal record, previous hospitalization and treatment for bipolar disorder, six months of stability while incarcerated, ongoing medication and mental health treatment, the characterization of his threats as "psychotic rantings" that were being addressed, and support from friends.  Counsel claimed avoiding incarceration and improving his mental health and well-being would serve as "tremendous incentives" for Summerville to complete mental health diversion.  Summerville also submitted 89 certificates for programming completed while in custody, including several courses on mental health and substance abuse, as well as career development and language courses.

The prosecution argued Summerville was not suitable for pretrial diversion because he posed an unreasonable risk of committing a super strike.  It cited his threats to kill his mother, acts of violence against family members and his grandmother's neighbor, a threat to blow up his sister's car, a prior bomb threat to an animal shelter over his cat, and throwing a rock through the neighbor's window.  The prosecution also emphasized that his conduct was "escalating and expanding."  Additionally, it argued that Summerville had not demonstrated a willingness to comply with the restraining order.

The prosecutor read into the record the victim impact statement written by Summerville's mother, in which she stated that he was not suitable for diversion because his actions had "come to a point of dangerous escalation."  She expressed that she and her daughters were afraid in their home and that, despite the restraining order, Summerville continued to make violent threats against them.

The court indicated it had to consider all six enumerated factors under section 1001.36 when exercising its discretion.  It also acknowledged that to find Summerville

5

posed an unreasonable risk to public safety it must find he is likely to commit a super strike as defined in section 1170.18. The court denied mental health diversion stating: "Here, we have evidence that the defendant has made statements of threatening to kill his own mother, making threats of creating a bomb to use at a location, as well as other threats to his own family. [¶] I would note that, also, it appears that the evidence indicates that the threats have been expanding to other people in his family members. And so, I do find that the defendant is likely to commit a super strike. [¶] And even if the Court were to find that all six factors were met . . . for mental health diversion, . . . and the prima [facie] . . . case was shown that all six requirements were met, the . . . Court may still exercise its discretion in denying diversion. There is some discretion the Court is allowed to exercise that must be consistent with the principles and purposes of the governing law. [¶] Here, we have someone who has repeatedly violated restraining orders in the past. And although we have multiple cases here, multiple circumstances, and given the totality of the circumstances of the offenses, I believe that makes the defendant unsuitable for mental health diversion, and find him unsuitable based on those totality of the circumstances, even if all six factors were met. [¶] And so for those reasons, the Court is going to deny mental health diversion application for his three matters."

Summerville pled no contest to stalking (§ 646.9, subd. (a)) and vandalism (§ 594, subd. (a)). In exchange, the court dismissed the misdemeanor case and the additional stalking count (§ 646.9, subd. (b)) and granted Summerville two years of formal probation. As a condition of probation, Summerville was required to "seek and obtain professional counseling and/or treatment." Summerville appealed.

## DISCUSSION

Summerville argues the trial court abused its discretion when it found he was not suitable for mental health diversion because he posed an unreasonable risk of danger to public safety. The People claim Summerville was not eligible for mental health diversion

and that the court did not abuse its discretion. We conclude that Summerville has not met his burden to demonstrate an abuse of discretion.

Section 1001.36 "authorizes pretrial mental health diversion for defendants with qualifying mental health disorders." (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147 (*Whitmill*).) The purposes of mental health diversion are to "mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety," allow "local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders," and "meet[] the unique mental health treatment and support needs of individuals with mental disorders." (§ 1001.35, subds. (a)-(c).)

Section 1001.36 prescribes a two-step analysis. (§ 1001.36, subds. (b), (c).) First, the trial court considers whether the defendant is eligible for mental health diversion. (*Id.*, subd. (b).) The trial court must find eligibility if (1) the defendant has been diagnosed with a qualifying mental disorder within the last five years by a qualified mental health expert, and (2) the defendant's mental disorder was a significant factor in the commission of the charged offense. (*Ibid.*) "If the defendant has been diagnosed with a mental disorder, the court shall find that the defendant's mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense." (*Ibid.*)

Second, if a defendant meets the eligibility requirements, the court also must find that the defendant is suitable for pretrial diversion based on satisfaction of the following criteria: "(1) In the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment. [¶] (2) The defendant consents to diversion and waives the defendant's right to a speedy trial . . . . [¶] (3) The defendant agrees to comply with treatment as a condition of diversion . . . . [¶] [and] (4) The

defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subd. (c)(1)-(4).)

Under section 1170.18, an unreasonable danger to public safety is an unreasonable risk that the petitioner will commit a "super strike," which includes any homicide or attempted homicide offense, any serious or violent felony punishable by life imprisonment or death, and sexually violent offenses. (§§ 1170.18, subd. (c), 667, subd. (e)(2)(C)(iv).)

We review a trial court's ruling on a petition for mental health diversion for abuse of discretion. (*Whitmill*, *supra*, 86 Cal.App.5th at p. 1147; *People v. Moine* (2021) 62 Cal.App.5th 440, 448-449.) We review the trial court's factual findings as to the enumerated statutory criteria for substantial evidence. (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1079.) "A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence." (*Moine*, at p. 449.) Under this deferential standard of review, " 'we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Gerson*, at p. 1079.)

A.    *Eligibility*

The People claim, for the first time on appeal, that Summerville was ineligible for mental health diversion because he was not diagnosed with a mental disorder by a "qualified mental health expert" within the last five years. The People's argument has no merit.

The People assert that assessments performed by Angela Hall, a licensed clinical social worker, are insufficient to meet the eligibility criteria in section 1001.36, subdivision (b)(1). They argue that there is no evidence Hall's qualifications as a licensed clinical social worker meet the definition of a "qualified mental health expert" or

8

indicate when Summerville obtained the diagnosis. In failing to raise this argument before the trial court, the People have forfeited this claim. (*People v. Trujillo* (2015) 60 Cal.4th 850, 856.)

Section 1001.36, subdivision (f)(2) defines the term "qualified mental health expert." It states that a qualified mental health expert "includes, but is not limited to, a psychiatrist, psychologist, a person described in Section 5751.2 of the Welfare and Institutions Code, or a person whose knowledge, skill, experience, training, or education qualifies them as an expert." Licensed clinical social workers are expressly identified and subject to Welfare and Institutions Code section 5751, subdivision (b) so it is clear and we find that a licensed clinical social worker is a qualified mental health expert.

B.      *Suitability*

In ruling on Summerville's mental health diversion petition the court acknowledged section 1001.36's enumerated criteria. Here, there was evidence Summerville had no criminal record, a clinical assessment indicated he did not present a danger to others, Summerville was previously diagnosed and received treatment for bipolar disorder in the community, and the underlying crimes were not super strike offenses. However, that is not determinative. (See *People v. Hall* (2016) 247 Cal.App.4th 1255, 1266 [rejecting argument that the court may only exercise its discretion to find an unreasonable risk to public safety when considering an offender who has previously committed a super strike].) "When determining whether the defendant will pose an unreasonable risk of danger to public safety, '[t]he court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate.' " (*People v. Graham* (2024) 102 Cal.App.5th 787, 799, quoting § 1001.36, subd. (c)(4).)

Summerville argues there is no evidence he ever carried out his threats, citing to *Whitmill* and *Moine*. We are not persuaded. In *Whitmill*, the court concluded that there

9

was no substantial evidence to support a finding the defendant was an unreasonable risk to public safety because after firing a gun in the air the defendant ran away from further confrontation, threw away his firearm, and peacefully complied with law enforcement. (*Whitmill*, *supra*, 86 Cal.App.5th at pp. 1142-1143, 1151.) In *Moine*, the defendant threatened two different medical care providers that he would shoot and kill them. (*People v. Moine*, *supra*, 62 Cal.App.5th at pp. 444-445.) However, after making the threats, he immediately and profusely apologized. (*Id*. at p. 445.) The court in *Moine* concluded the trial court abused its discretion because "[t]here [was] nothing in the record to indicate the prosecution presented evidence to suggest [the defendant] was likely to commit such an offense in the future, and the circumstances of the pending charges did not support such an inference." (*Id*. at pp. 450-451.)

Here, unlike in *Whitmill* and *Moine*, substantial evidence demonstrates Summerville took affirmative steps to follow through on his violent threats. In June 2023, after months of continued threats of physical violence against his family, Summerville threw a clear liquid at his mother's home, which his mother said smelled like gasoline. This incident prompted his mother and sister to obtain a temporary restraining order. Three days later, after being served with a temporary restraining order, Summerville called, texted, and e-mailed his mother over 50 times in violation of the temporary restraining order. In those text messages, he threatened to kill or physically harm members of his family.

Approximately three weeks later, Summerville vandalized his sister's car by keying the side and denting the trunk. Later that day, he sent text messages to his mother, stating he was going to "blow up" her car and demanding that his sister "get out of his email account before he d[id] more to her car." He also texted his sister, warning that vandalizing her car was a "warning" and that he was not "playing." Additionally, Summerville texted his mother, threatening to kill her or "he would have someone he knows do it."

The next day he detonated a cherry bomb on the front porch of his mother's home and vandalized his mother's, grandmother's, and his grandmother's neighbor's properties. We can infer that the trial court was concerned that Summerville was likely to further act on his violent threats and commit a "super strike"—namely mayhem, arson, or detonating a destructive device with intent to injure—because he threw gasoline and detonated a cherry bomb on his mother's front porch. (§§ 667.5, subd. (c), 1192.7, subd. (c); see *People v. Bunas* (2022) 79 Cal.App.5th 840, 862 ["[T]here is nothing in section 1001.36, with respect to . . . suitability, that precludes a trial court from relying primarily, or even entirely, on the circumstances of the charged offense or offenses in denying a motion for diversion"].)

Summerville's repeated violations of the restraining order, although not super strike offenses, support the court's finding. Based on the totality of the circumstances, the violent nature of his actions supports a conclusion that Summerville posed an unreasonable risk of danger to public safety. (*People v. Graham*, *supra*, 102 Cal.App.5th at p. 799.)

Summerville further asserts that denying mental health diversion represented an abuse of discretion because it was inconsistent with the later decision by a different judge to place him on probation. We see no inherent contradiction in the decisions of two different judges, made three and one-half months apart, to deny mental health diversion and place Summerville on probation. In *People v. Frahs* (2020) 9 Cal.5th 618, the People argued that ineligibility for probation disqualifies a defendant from mental health diversion because " 'diversion is similar in many respects to probation.' " (*Id.* at p. 639.) The California Supreme Court rejected this argument, concluding that "the Legislature left it to trial courts to make fact-specific evaluations of risk under" section 1001.36 and "a defendant may be ineligible for probation for numerous reasons other than being found to be an unreasonable risk of danger to public safety." (*Frahs*, at p. 639.) Denying mental health diversion while later imposing a sentence of probation is not necessarily

11

contradictory.  (See *People v. Pacheco* (2022) 75 Cal.App.5th 207, 214-215 [affirming trial court's denial of diversion because "[m]ental health diversion may provide some motivation for remaining drug free and compliant with treatment for mental illness" but felony probation and the threat of prison "will provide even more motivation"].)

The fact that reasonable minds may differ as to the appropriate resolution of an issue does not signal an abuse of discretion.  (*People v. Clair* (1992) 2 Cal.4th 629, 655.) On appeal, it is insufficient to present facts which merely afford an opportunity for a difference of opinion.  (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65.)  "An appellate tribunal is not authorized to substitute its judgment for that of the trial judge.  [Citation.] A trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice.  [Citation.]  In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered."  (*Ibid*.)  On this record, Summerville has not met his burden to demonstrate an abuse of discretion.

DISPOSITION

The judgment is affirmed.


/s/       <br>BOULWARE EURIE, J.


We concur:


/s/      <br>EARL, P. J.


/s/      <br>DUARTE, J.